08-0947-cv
Warney v. Monroe County

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2008

(Argued: June 1, 2009          Decided: November 13, 2009)

Docket No. 08-0947

- - - - - - - - - - - - - - - - - - - - -x

DOUGLAS WARNEY,

                    Plaintiff-Appellee,

          - v.-

MONROE COUNTY, LARRY BERNSTEIN, in his
individual capacity, WENDY EVANS LEHMAN, in
her individual capacity and MICHAEL C.
GREEN, in his individual and official
capacities,

                    Defendants-Appellants,

CITY OF ROCHESTER, SANDRA ADAMS, in her
individual capacity, EVELYN BEAUDRAULT, in
her individual capacity, STEPHEN EDGETT, in
his individual capacity, THOMAS JONES, in
his individual capacity, ROBERT GARLAND, in
his individual capacity, JOHN GROPP, in his
individual capacity, JOHN DOE OFFICERS
AND/OR DETECTIVES # 1-10, in their
individual capacities and RICHARD ROE
SUPERVISORS # 1-10, in their individual
capacities,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - -x

Before:     JACOBS, Chief Judge, NEWMAN and POOLER, Circuit Judges.

Appeal by prosecutors from denial of their motion for absolute or qualified immunity by the United States District Court for the Western District of New York (Larimer, J.) in a suit alleging that the exculpatory result of post-trial DNA testing, conducted by the district attorney's office while defending habeas and other initiatives, was not timely disclosed to plaintiff Douglas Warney, who was in jail for a murder that the DNA testing ultimately showed he did not commit.  Because the testing was undertaken in connection with post-trial proceedings and was therefore integral to the advocacy function, we hold that the prosecutors enjoy absolute immunity under Imbler v. Pachtman, 424 U.S. 409, 430–31 (1976).  Reversed.

MICHAEL E. DAVIS, Second Deputy County Attorney, for DANIEL M. De LAUS, JR., Monroe County Attorney, Rochester, NY, for Defendants-Appellants.

DEBORAH L. CORNWALL, (Peter J. Neufeld, Sarah Crowley, on the brief), Cochran Neufeld & Scheck, LLP, New York, NY, for Plaintiff-Appellee.

Steven A. Bender and Anthony J.

Servino, for Daniel M. Donovan, President of the District Attorneys Association of New York State, for amicus curiae District Attorneys Association of New York State, in support of Defendants-Appellants.

DENNIS JACOBS, Chief Judge:

Three prosecutors of Monroe County appeal from denial of their motion for absolute or qualified immunity by the United States District Court for the Western District of New York (Larimer, J.) in a suit alleging that the exculpatory result of post-trial DNA testing, conducted by the district attorney's office while defending habeas and other initiatives, was not timely disclosed to plaintiff, who was in jail for a murder that the DNA testing ultimately showed he did not commit. Because the testing was undertaken in connection with post-trial proceedings and was therefore integral to the advocacy function, we hold that the prosecutors enjoy absolute immunity under Imbler v. Pachtman, 424 U.S. 409, 430-31 (1976).

Plaintiff Douglas Warney was wrongfully convicted and jailed for ten years. He sues a number of individuals (and government entities) for violating his constitutional

3

rights.  This appeal considers only issues bearing upon the liability and immunity of three Monroe County prosecutors for failing to disclose exculpatory DNA test results promptly.

After Warney's conviction, during the pendency of his federal habeas corpus petition and his appeal from a state-court decision denying him access to DNA evidence, the Monroe County District Attorney's office arranged the DNA testing of crime scene evidence.  The results showed that all non-victim blood samples collected at the scene of the crime were from one man, who was not Warney.  Using the DNA results, the prosecutors identified the man who actually committed the murder, advised Warney's counsel, interviewed the new suspect to confirm that Warney was not involved, and then achieved Warney's exoneration.  Warney alleges that his constitutional rights were violated because at least 72 days elapsed between the date the prosecutors learned of the DNA test results and the date they informed Warney or his counsel.

This appeal requires us to consider the scope of absolute prosecutorial immunity in the post-conviction context.

4

## BACKGROUND

We set out only the facts that bear upon the disposition of this appeal. Since this is an interlocutory appeal from the denial of a motion to dismiss, we accept as true all well-pled factual allegations, and draw all reasonable inferences in the plaintiff's favor. See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

**A.  The Murder.**  In January 1996, William Beason was found dead in his ransacked apartment on Chili Avenue in Rochester, New York by officers of the Rochester Police Department ("RPD").  In Beason's bathroom, they found a bloodstained knife, a bloody towel, and a bloody tissue. The RPD lifted several fingerprints from two pornographic videotape boxes found in the bedroom, and one partial print from the knife.  The autopsy showed nineteen stab wounds to Beason's neck and chest, all of them consistent with the bloody knife found in the bathroom, and defensive wounds on Beason's left hand.  Blood evidence was collected from his fingernails.  Thus it appeared that Beason died after a violent struggle, and that the perpetrator was cut and had

5

gone into the bathroom to clean blood off himself with the towel and the tissue.

After Beason's murder was reported in the press, Douglas Warney called the RPD "Crimestoppers hotline" and referenced the murder. Warney had an IQ of 68, an eighth-grade education, and full-blown AIDS. (Complaint ¶ 37.) It is not clear what Warney said, but he alleges that he said that he "knew of" Beason.[1] An RPD officer went to Warney's apartment to speak to him. The complaint alleges that the RPD was aware that Warney had made numerous crank calls to the police (for which he had received psychiatric assistance), and this officer in particular had responded to Warney's complaints about drug activity in his apartment building. (Id. ¶ 39.) Warney told this officer that he was concerned about his name being brought up in connection with the murder of a "William" on Chili Avenue.

Two days later, RPD detectives picked up Warney at his apartment and brought him to the police station. They put him in a small office and interrogated him, using

---

[1] Beason and Warney had a "passing acquaintance." (Complaint ¶¶ 37-38.) On occasion, Beason had hired Warney to clean his house and shovel snow from his driveway. (Id.)

"escalating coercive tactics" including verbal abuse, and physical and other threats, "in order to force him to admit that he committed the murder." (Id. ¶ 47.) After initial denials, Warney eventually "yielded to [the] coercive tactics and provided at least four wildly different versions of events to the police." (Id. ¶¶ 50-51.)[2]

In an ensuing typewritten "confession," the detectives included numerous non-public facts about the murder known only to the police and the real killer, facts which (it is now known) Warney could not possibly have known. (Id. ¶ 52.)[3] According to the complaint, there were

---

[2] In the first version, Warney implicated his cousin. In the second, Warney added that he and his cousin went together to Beason's home. In the third, Warney and his cousin together stabbed Beason. In the fourth, reflected in the typewritten statement, his cousin was no longer present, and Warney confessed to murdering Beason alone. (Complaint ¶ 51.)

[3] These facts included: (1) Beason was cooking barbeque chicken and mashed potatoes at the time he was killed; (2) Beason was wearing a red and white striped nightshirt; (3) Beason was stabbed more than fifteen times with a twelve-inch serrated knife; (4) Beason's throat was slit; (5) Beason's body was found on his bed and his eyes were open; (6) the assailant cut himself and bled in the apartment; (7) the assailant wiped his wound with tissue paper, which he discarded in the toilet; (8) the assailant put intensive care lotion on his wound; and (9) the back door and basement door were locked and the front door of the house locks automatically. (Complaint ¶ 53.) The complaint alleges that the detectives "deliberately failed to disclose

7

"inconsistencies" in Warney's statement that rendered it wholly implausible.[4]

Warney signed the confession and initialed minor changes less than four hours after he had been picked up.[5] According to the complaint, after Warney's "confession" the police performed no further investigation other than trying to determine whether Warney's cousin could have been an accomplice. Notably, the latent fingerprint collected from a pornographic videotape box was not run through the

---

to the prosecutor and to defense counsel the material exculpatory fact that they fed the non-public details of the crime to Mr. Warney." (Id. ¶ 67.)

[4] The inconsistencies are that: (1) Warney's confession says that he killed Beason downstairs, and dragged him up to the bedroom; (2) Warney's statement said he drove his brother's Chevrolet to Beason's house, even though Warney's brother does not own a car; and (3) Warney's hands had no cuts or bruises, even though his confession says he got cut and bled at the scene. (Complaint ¶ 62.)

[5] At 5:30 p.m., the detectives took Warney to the "Public Safety Building," and placed him in a secured interview room to "elicit further false confessions and corroborate the [initial] falsified confession." (Complaint ¶ 57.) In this second "confession," Warney was said to have volunteered another detail mentioned in the crime scene reports--that pornographic video tapes featuring a white male and Hispanic male were found in Beason's bedroom--and that he and Beason had watched the tape together before the murder. (Id. ¶ 58.)

statewide database.[6]  (Id. ¶ 63.)

**B.  The Trial.**  Certain blood evidence at the scene was found to exclude both Warney and Beason; so Warney was charged both as a principal and an accomplice.  At trial, however, the prosecution's only theory was that Warney committed the murder alone, and the prosecution's case rested "almost exclusively" on Warney's confession. (Complaint ¶¶ 79-80.)

At trial, a chemist testified that the blood on the murder weapon was consistent with the victim's Type O, but <u>inconsistent</u> with Warney's Type A; and the bloodstains on the towel and tissue belonged neither to Beason nor Warney. (It fit neither of their "enzyme types.") (Complaint ¶ 74.) Of three latent prints from the pornographic videotape boxes, two belonged to Beason, and the third was unidentified, meaning it belonged to neither Beason nor Warney.[7]  A second fingerprint specialist examined a partial print from the murder weapon, and found only "three points

---

[6] If the fingerprint had been run, as it later was, it would have matched a man named Eldred Johnson.  Johnson's fingerprints were in the database as of January 1996 (due to crimes he committed in 1994).  (Complaint ¶¶ 63, 77.)

[7] The unidentified print later matched Eldred Johnson. <u>See</u> <u>supra</u> note 6.

9

of comparison," but concluded that Warney was a <u>possible</u> source of the print. (He also specifically excluded Beason.) (<u>Id.</u> ¶ 78.)

Warney testified to his innocence and about the threats from the police that made him confess.

On February 12, 1997, the jury convicted Warney of two counts of second-degree murder. On February 27, he was sentenced to 25 years to life. The judgment was affirmed on appeal, <u>People v. Warney</u>, 299 A.D.2d 956, 750 N.Y.S.2d 731 (4th Dep't 2002), and became final when the New York Court of Appeals denied leave to appeal on March 4, 2003, 99 N.Y.2d 633, 790 N.E.2d 289 (2003).

**C. Post-Conviction Proceedings**. In May 2004, Warney filed a federal habeas corpus petition under 28 U.S.C. § 2254 in the United States District Court for the Western District of New York, <u>Warney v. McGinnis</u>, No. 04-cv-6202(L) (filed May 4, 2004), a filing of which we take judicial notice. Warney thereafter began seeking access to biological evidence from the murder scene in order to conduct DNA testing that he believed would exonerate him. Warney's attorney requested access to the evidence so as to perform DNA testing at his own expense, but the Monroe

County District Attorney's office refused consent. (Complaint ¶ 91.)

In October 2004, Warney moved under New York State's post-conviction statute, N.Y. Crim. Proc. Law 440.30(1-a) (McKinney 2004) (the "440 motion"), seeking access to the blood evidence found at the crime scene. The 440 motion sought access to, inter alia, blood found on the murder weapon (which had been tested already), and blood found on the victim's fingernails (which had not been tested before).

The Monroe County District Attorney's Office, represented by District Attorney Michael C. Green and Assistant District Attorney Wendy Evans Lehman, opposed the 440 motion, both in writing and at a hearing on November 15, 2004 before New York State Supreme Court Justice Francis A. Affronti. (Complaint ¶ 93.) At the hearing, the District Attorney's office argued that Warney had not established due diligence, and that the reasons underlying his request for access to the blood evidence were speculative. (Id.)

The 440 motion was denied in an order issued December 15, 2004, on the grounds that DNA testing "would not provide evidence which is significantly different from that submitted to the jury which convicted [Warney]," and that

11

the request was based on "conjecture . . . too speculative and improbable."  (Id. ¶ 94.)  Warney appealed to the Appellate Division.

**D. DNA Testing and Exoneration.**  In February 2005, while the Monroe County District Attorney's office was opposing Warney's appeal from the denial of his 440 motion, and while Warney's federal habeas petition was still pending, Second District Attorney Larry Bernstein submitted for DNA testing the blood evidence that was the subject of Warney's 440 motion--a total of seven samples, including the blood found under the victim's fingernails and on the murder weapon.  Bernstein did so with the authorization of the District Attorney, and without informing the state or federal court, Warney, or Warney's attorney.[8]  (Id. ¶ 95.)

Warney alleges that, "[u]pon information and belief, defendants Green, Bernstein, Lehman, and others in the DA's office received a verbal report of the DNA test results from the Monroe County Public Safety Laboratory as early as 2005."  (Id. ¶ 97 (emphasis added)).  The complaint does not say when in 2005 the alleged verbal report was received, or

---

[8]  At oral argument, Warney's counsel maintained that the DNA testing was destructive, such that once tested, the blood samples could not be retested.

what it contained other than that it was "exculpatory." (Id.)

On February 17, 2006, approximately one year after submitting the evidence to be tested, the District Attorney's office received a written laboratory report showing that each of the seven blood samples submitted matched a single profile of a man who was neither Beason nor Warney. The results of the testing were not immediately disclosed to Warney or his lawyer.

Two weeks later, on March 2, 2006, the prosecutors learned more: a search of the FBI's Combined DNA Indexing System (CODIS) database matched the profile to a man named Eldred Johnson, who had been convicted of murder, as well as several slashings and burglaries, and who was then serving a life sentence in Utica, New York.

The district attorneys took the additional step of ordering examination of the unidentified fingerprint found on the pornographic videotape box. On March 24, 2006, an evidence technician from the RPD determined that the fingerprint also matched Eldred Johnson.

The DNA testing results and the fingerprint match were disclosed to Warney for the first time on May 1, 2006, when

Monroe County attorneys informed Warney's counsel that Warney had been excluded as the source of the blood evidence, though they did not advise that all the previously unidentified blood was from the same man. From February 17, 2006 to May 1, 2006 is a period of 72 days.

On May 11, 2006, the District Attorney's office interviewed Eldred Johnson, who promptly confessed to the murder of Beason. Johnson said that he had acted alone, and did not know Douglas Warney. The next day, the District Attorney's office informed Warney's counsel of Johnson's confession. Four business days after the confession (May 16, 2006), on application of the Monroe County District Attorney's office, Warney's murder conviction was vacated.

In vacating Warney's conviction, Justice Van Strydonck pointed out that the inconsistencies in the blood evidence, (i.e., the presence of a third source of blood) was known at the time of trial: "the 'newly found evidence' is not the fact that a third person's blood was found at the scene . . . [or] that Mr. Warney's confession was inconsistent in many important ways with the facts developed by the police and the prosecutor's office. Those inconsistencies were known by the defense and argued to the jury. Rather the newly

14

discovered evidence is the confession of Mr. Eldred Johnson."

Warney was released from prison, and Eldred Johnson later pleaded guilty to the Beason murder.

**E. This Lawsuit.** Warney filed suit under 42 U.S.C. § 1983 against numerous defendants, including the City of Rochester; Monroe County; various police officers and detectives; and three prosecutors in the Monroe County District Attorney's office: Michael Green,[9] Larry Bernstein, and Wendy Evans Lehman.

The complaint initially pleaded three claims relating to the prosecutors: (1) a due process claim for bad faith denial of post-conviction access to biological evidence and DNA testing (Count VI, which has since been withdrawn as to the individual prosecutors); (2) a due process claim for failing to promptly disclose material exculpatory evidence (Count VII, which is at issue on this appeal); and (3) a claim against Monroe County (Count IX, under <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978)), for having a custom or policy of withholding biological evidence

---

[9] The complaint named Green in both his individual capacity and his official capacity as District Attorney.

in bad faith, and failing to promptly disclose exculpatory information.

Defendants Green, Bernstein, and Evans Lehman, and Monroe County moved to dismiss all counts against them on grounds of absolute prosecutorial immunity, qualified immunity, and failure to state a claim under Monell.[10] By Decision and Order dated February 11, 2008, the district court denied the defendants' motion to dismiss in all respects.[11] In summary, the district court concluded that the prosecutors were acting in an "investigative" capacity when they submitted the DNA evidence for testing and when they later withheld the results, and they were therefore not entitled to absolute immunity under Imbler, 424 U.S. at 430-31. The court further concluded that the prosecutors were not entitled to qualified immunity because reasonable prosecutors should have known that failing to disclose compelling exculpatory information for a period of at least

---

[10] As to the Monell claim, Monroe County urged that the claim related only to acts undertaken by the District Attorney in his prosecutorial capacity, and in that capacity a District Attorney acts as an agent of the State of New York, not as an agent of a particular county.

[11] However, the court did dismiss all claims against Green in his official capacity because it found such claims were subsumed by the Monell claim against Monroe County.

72 days violated a clearly established, substantive due process right.

The prosecutors and Monroe County appeal.

**DISCUSSION**

When a district court denies immunity on a Rule 12(b)(6) motion to dismiss, "we review the district court's denial <u>de novo</u>, accepting as true the material facts alleged in the complaint and drawing all reasonable inferences in plaintiffs' favor." <u>Johnson v. Newburgh Enlarged School Dist.</u>, 239 F.3d 246, 250 (2d Cir. 2001).

We have jurisdiction to review a denial of qualified immunity under the collateral order doctrine if the denial "'turns on an issue of law.'" <u>Iqbal</u>, 129 S. Ct. at 1946 (quoting <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 530 (1985)).

**I**

The Supreme Court first acknowledged the absolute immunity of prosecutors to § 1983 suits in <u>Imbler v. Pachtman</u>, 424 U.S. 409 (1976). The Court relied on a common law tradition of prosecutorial immunity, as well as strong policy considerations that supported extending immunity to the § 1983 context: "A prosecutor is duty bound to exercise

17

his best judgment both in deciding which suits to bring and in conducting them in court.  The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages."  Imbler, 424 U.S. at 424-25.

Imbler defined the scope of prosecutorial immunity not by the identity of the actor, but by reference to the "function" performed.  Id. at 430.  Those acts that are "intimately associated with the judicial phase of the criminal process" would be shielded by absolute immunity, but not "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate."  Id. at 430-31.

Thus, to establish immunity, the "ultimate question" is "whether the prosecutors have carried their burden of establishing that they were functioning as 'advocates' when they engaged in the challenged conduct."  Doe v. Phillips, 81 F.3d 1204, 1209 (2d Cir. 1996).  "A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the

initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993); see also Parkinson v. Cozzolino, 238 F.3d 145, 150 (2d Cir. 2001) ("The cases thus draw a line between the investigative and administrative functions of prosecutors, which are not protected by absolute immunity, and the advocacy functions of prosecutors, which are so protected.").

Drawing this line between "advocacy" and "investigative" functions is vexed, perhaps no more so than in the post-conviction context.[12] For once a conviction becomes final, there is no longer a pending adversarial criminal proceeding; the "judicial phase" is technically finished. Yet, by the nature of their office, prosecutors will necessarily remain involved in criminal cases: opposing civil habeas petitions (or other forms of collateral relief); amending restitution orders; pursuing parole violations; or resolving disputes over a prisoner's projected release date. These functions may be somewhat

---

[12] Imbler specifically avoided the post-conviction context. See Imbler, 424 U.S. at 431 ("We hold only that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." (emphases added)).

19

administrative, and may not always relate to in-court advocacy, yet often they are integral to an ongoing "judicial phase" of a prosecution.

Confronted with questions about the scope of absolute prosecutorial immunity post-conviction, federal appellate courts have stressed different aspects of the analysis, and come to apparently conflicting results. Compare Houston v. Partee, 978 F.2d 362, 366 (7th Cir. 1992) (no absolute immunity where prosecutors were "not personally prosecuting the appeal" in post-conviction proceedings), with Carter v. Burch, 34 F.3d 257, 263 (4th Cir. 1994) (absolute immunity where prosecutor "was handling the post-conviction motions and the initial direct appeal . . . [and thus] still functioning as an advocate for the State"). Most recently, the Third and Sixth Circuits have suggested that absolute immunity should extend to post-conviction conduct so long as the prosecutor can show that an advocacy function was being performed. See Yarris v. County of Delaware, 465 F.3d 129, 137 (3d Cir. 2006) ("After a conviction is obtained, the challenged action must be shown by the prosecutor to be part of the prosecutor's continuing personal involvement as the state's advocate in adversarial post-conviction proceedings

20

to be encompassed within that prosecutor's absolute immunity from suit."); Spurlock v. Thompson, 330 F.3d 791, 799 (6th Cir. 2003) ("[a]bsolute immunity applies to the adversarial acts of prosecutors during post-conviction proceedings . . . where the prosecutor is personally involved . . . and continues his role as an advocate," but "where the role as advocate has not yet begun . . . or where it has concluded, absolute immunity does not apply.").

Our Court has not addressed the scope of immunity enjoyed by prosecutors in collateral proceedings; but we have held that absolute immunity extends to actions taken while working on direct appeals. Parkinson, 238 F.3d at 151–52. As we wrote in Parkinson:

> We now join these courts in holding that absolute immunity covers prosecutors' actions after the date of conviction while a direct appeal is pending. We express no opinion as to when such immunity ends; the prosecutors' actions in this case occurred while [the defendant's] direct appeal was pending, and we have little difficulty extending absolute immunity that far. [FN 5]
>
> [FN 5] Specifically, because the facts of this case do not raise the issue, we do not decide whether absolute immunity extends to collateral proceedings, such as habeas petitions.

238 F.3d at 152 & n.5.

**II**

On the facts of this case, we must now decide whether, and how, absolute immunity extends to prosecutors working on post-conviction collateral proceedings.  We see no principled reason to withhold absolute immunity for work performed in defending a conviction from collateral attack.

As we noted in Parkinson, there is language from some Supreme Court decisions to the effect that "absolute immunity appl[ies] to 'acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial.'"  238 F.3d at 151 (quoting Buckley, 509 U.S. at 273).  But "[s]uch language . . . does not serve to delineate the endpoint of immunity. Rather, it simply underscores the fact that absolute immunity does not apply to the investigatory duties of a prosecutor, that is, it serves to establish the starting point of such immunity." Id. (emphases in original).

Although a collateral attack is technically a separate, civil proceeding, a prosecutor defending a post-conviction petition remains the state's advocate in an adversarial proceeding that is an integral part of the criminal justice

system.[13]  The considerations that militate in favor of absolute immunity for work done at trial or on appeal are just as relevant in the context of a collateral proceeding. A post-conviction petition often presents the same kinds of legal issues as the underlying criminal case, requires the same kinds of legal judgments, and calls upon the same kinds of advocacy skills and measures.  Often the same prosecutor who conducted the trial will oppose the post-conviction challenge.

Several courts have already held, or suggested, that absolute immunity shields work performed by prosecutors opposing habeas petitions.  See, e.g., Spurlock, 330 F.3d at 799 ("Absolute immunity applies to the adversarial acts of prosecutors during post-conviction proceedings, including direct appeals, habeas corpus proceedings, and parole proceedings, where the prosecutor is personally involved in the subsequent proceedings and continues his role as an advocate."); Summers v. Sjogren, 667 F. Supp. 1432, 1434 (D. Utah 1987) (a prosecutor who allegedly filed false documents

---

[13]  See U.S. Const. art. II, § 9, cl. 2 ("The privilege of the writ of habeas corpus shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it.").

23

in opposition to a habeas petition "does not lose immunity merely because she was acting in a post-conviction setting").  We join these courts in holding that absolute immunity shields work performed during a post-conviction collateral attack, at least insofar as the challenged actions are part of the prosecutor's role as an advocate for the state.

**III**

Having established that absolute prosecutorial immunity may extend to advocacy work performed in the post-conviction context, we must determine whether such immunity is warranted in this case.

The answer depends in part on whether one looks at the prosecutors' discrete actions, or at their role and function in an ongoing proceeding.  If one focuses on the DNA testing, the prosecutors' conduct might be classified as investigative; if one focuses on the act of delaying disclosure, the prosecutors' conduct might be classified as administrative, or possibly investigative; if one focuses on the opposition to Warney's 440 motion and habeas petition, the prosecutors' conduct might be classified as pure advocacy.

24

The district court, which focused on the testing and the delay in disclosure, declined to extend absolute immunity because it considered the prosecutors' actions to be "investigatory . . . no different than [] law enforcement officials' acts in obtaining and allegedly suppressing favorable evidence."

Warney does not complain that the prosecutors ordered the testing; after all, that testing is what led to his release. Nor is Warney complaining (here) about the denial of access to test the DNA for himself.[14] Nor is he complaining of non-disclosure of the test results-- disclosure was made. Warney's narrow focus is (understandably) on the specific act that caused his harm: the failure to disclose the DNA results promptly.

For the following reasons, we conclude that it is unhelpful to ascertain the prosecutors' functional role by isolating each specific act done or not done; rather, a prosecutor's function depends chiefly on whether there is

---

[14] Warney voluntarily withdrew his claim relating to bad-faith denial of access to evidence. Its validity would, in any event, be called into question by the Supreme Court's recent decision in District Attorney's Office for the Third Judicial District v. Osborne, 129 S. Ct. 2308, 2322 (2009) (finding no substantive due process right to DNA evidence post-conviction).

pending or in preparation a court proceeding in which the prosecutor acts as an advocate.

Unless the DNA testing is considered with reference to context, it is impossible to classify functionally. If the testing inculpated Warney, it would be a potent tool of the advocacy; if it exculpated Warney, it might be deemed administrative, in the sense that it would entail disclosure; if it inculpated someone else, it would be investigative, at least to the extent that it might identify the real killer. But the steps taken here--testing, disclosure, and even the delay in making disclosure, as well as the identification of the real killer--were integral to and subsumed in the advocacy functions being performed in connection with Warney's post-conviction initiatives. The decisions made by the prosecutors in this case--whether to test for potentially inculpatory (or exculpatory) information, how and when to disclose or use that information, and whether to seek to vacate Warney's conviction--were exercises of legal judgment made in the "judicial phase" of proceedings integral to the criminal justice process.

The DNA testing obviously would have bearing on the

26

advocacy work of deciding whether to oppose Warney's initiatives.  A prosecutor has an affirmative obligation, before filing an opposition, to ensure that the petition should in fact be opposed.  See Fed. R. Civ. P. 11(b) ("By presenting to the court a pleading . . . an attorney . . . certifies that to the best of the person's knowledge . . . the factual contentions have evidentiary support.").  The proper and useful focus for ascertaining the function being served by a prosecutor's act is therefore on the pendency of court proceedings that engage a prosecutor as an advocate for the state.

The Supreme Court recently taught us that a prosecutor enjoys absolute immunity even when doing an administrative act if the act is done in the performance of an advocacy function.  Van de Kamp v. Goldstein, 129 S. Ct. 855 (2009).  In Van de Kamp, the plaintiff had won habeas relief because the government failed to disclose at trial, as required by Giglio v. United States, 405 U.S. 150 (1972), that a jailhouse informant had previously received reduced sentences for providing favorable testimony.  In a § 1983 suit, the plaintiff alleged that the Los Angeles County District Attorney (and other prosecutors) failed to

establish information-sharing systems concerning jailhouse informants, and failed to train prosecutors on how to share such information.  The Ninth Circuit denied the prosecutors absolute immunity, on the theory that the alleged failures were more "administrative" than "prosecutorial." See Goldstein v. Long Beach, 481 F.3d 1170, 1171–72 (9th Cir. 2007).  In reversing, the Supreme Court held that the "administrative" tasks at issue (establishing information-sharing systems and training attorneys on how to share information) were "'intimately associated with the judicial phase of the criminal process.'"  Van de Kamp, 129 S. Ct. at 864 (quoting Imbler, 424 U.S. at 430).  The Court explained:

> Here, unlike with other claims related to administrative decisions, an individual prosecutor's error in the plaintiff's specific criminal trial constitutes an essential element of the plaintiff's claim.  The administrative obligations at issue here are thus unlike administrative duties concerning, for example, workplace hiring, payroll administration, the maintenance of physical facilities, and the like.  Moreover, the types of activities on which Goldstein's claims focus necessarily require legal knowledge and the exercise of related discretion, e.g., in determining what information should be included in the training or the supervision or the information-system management.  And in that sense also Goldstein's claims are unlike claims of, say, unlawful discrimination in hiring

28

employees. Given these features of the case before us, we believe absolute immunity must follow.

Id. at 862. Just as the administrative act in Goldstein was integral to an advocacy function, we conclude that the prosecutors' actions here--which could be seen as administrative or investigative--were also integral to the overarching advocacy function of dealing with post-trial initiatives challenging an underlying criminal conviction: they "require[d] legal knowledge and the exercise of related discretion." Id.

If the conduct challenged by Warney had occurred during Warney's trial, that is, if the prosecutors had tested all the evidence, and then sat on the exculpatory results for at least 72 days, they may well have violated Brady v. Maryland, 373 U.S. 83 (1963); but they would be absolutely immune from personal liability. See, e.g., Jones v. Shankland, 800 F.2d 77, 80 (6th Cir. 1986) (a prosecutor's "non-disclosure of exculpatory information [is] certainly entitled to absolute immunity"). The reason that is so is that the disclosure of evidence to opposing counsel is an advocacy function.

The disclosure decision in this case is advocacy

29

notwithstanding that the evidence would likely terminate the ongoing post-conviction proceedings in favor of the petitioner.  The advocacy function of a prosecutor includes seeking exoneration and confessing error to correct an erroneous conviction.  Thus prosecutors are under a continuing ethical obligation to disclose exculpatory information discovered post-conviction.[15]  Any narrower

---

[15] Rule 3.8 of the American Bar Association Model Rules of Professional Conduct reads:

> (g) When a prosecutor knows of new, credible and material evidence creating a reasonable likelihood that a convicted defendant did not commit an offense of which the defendant was convicted, the prosecutor shall:
>
> (1) promptly disclose that evidence to an appropriate court or authority, and
>
> (2) if the conviction was obtained in the prosecutor's jurisdiction,
>
> (i) promptly disclose that evidence to the defendant unless a court authorizes delay, and
>
> (ii) undertake further investigation, or make reasonable efforts to cause an investigation, to determine whether the defendant was convicted of an offense that the defendant did not commit.
>
> (h) When a prosecutor knows of clear and convincing evidence establishing that a

conception of a prosecutor's role would be truly alarming.

The prosecutors are therefore entitled to absolute immunity in this lawsuit. On the facts of this case, we need not, and do not, decide whether absolute immunity extends to prosecutorial conduct regarding DNA evidence, occurring after a prisoner's appeals and collateral attacks have been exhausted. Moreover, because we extend absolute immunity in this case, we do not address the prosecutors' alternative argument that they are entitled to qualified immunity.

**IV**

Affording absolute immunity in this context, with the resulting dismissal of Warney's claim against the prosecutors, does not deprecate the duty of prosecutors to prevent unjust imprisonment. Indeed, absolute immunity is afforded in part because we conclude that the duty is a part of the prosecutor's advocacy function. This outcome affords no incentive for concealment. A civil law suit is not a necessary enforcement mechanism for ensuring that

defendant in the prosecutor's jurisdiction was convicted of an offense that the defendant did not commit, the prosecutor shall seek to remedy the conviction.

31

prosecutors disclose exculpatory information promptly. Prosecutors remain ethically bound to disclose exculpatory information, and, in extreme cases of intentional suppression, prosecutors may be subject to criminal liability. See Imbler, 424 U.S. at 428-29 ("We emphasize that the immunity of prosecutors from liability in suits under § 1983 does not leave the public powerless to deter misconduct or to punish that which occurs. This Court has never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law.").

Moreover, the availability of absolute immunity in this context will likely encourage prosecutors in the future to seek exculpatory information post-trial. Absolute immunity of prosecutors is grounded in the fear that the "public trust of the prosecutor's office would suffer if [the prosecutor] were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages." Imbler, 424 U.S. at 424-25; see also Kalina v. Fletcher, 522 U.S. 118, 125 (1997) ("[I]t is the interest in protecting the proper functioning of the office, rather than the interest in protecting its occupant, that is

32

of primary importance."). "To be sure, this immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty. But the alternative of qualifying a prosecutor's immunity would disserve the broader public interest. It would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system." Imbler, 424 U.S. at 427-28. Prosecutors facing tough choices as to whether or not to seek exculpatory information post-conviction should not have to fear personal liability in the event that issues are raised later as to the evaluation and disclosure of what is learned during the pendency of post-conviction proceedings. Such a peril would be an incentive to avoid exculpatory inquiries.

**V**

Finally, Monroe County argues that Warney's claim against it should have been dismissed because the claim relates solely to actions undertaken by the Monroe County prosecutors in their "prosecutorial" capacity, and prosecutors acting in that capacity are agents of the State of New York, not agents of the particular county. See,

33

e.g., Baez v. Hennessy, 853 F.2d 73, 77 (2d Cir. 1988). Alternatively, Monroe County argues that Warney has failed to identify an underlying constitutional deprivation to support a claim under Monell, 436 U.S. 658.

Unlike the order denying immunity, the order denying Monroe County's motion to dismiss is not immediately appealable pursuant to the collateral order doctrine. See Coopers & Lybrand v. Livesay, 437 U.S. 463, 468 (1978) (under the collateral order doctrine, an appellate court may not exercise jurisdiction where an order does not "conclusively determine the disputed question"). Monroe County asks us to exercise pendent appellate jurisdiction; but in this Circuit we exercise pendent appellate jurisdiction only "over an independent but related question that is 'inextricably intertwined' with the [appealable issue] or is 'necessary to ensure meaningful review' of that issue." Kaluczky v. City of White Plains, 57 F.3d 202, 207 (2d Cir. 1995) (quoting Swint v. Chambers County Comm'n, 514 U.S. 35, 51 (1995)). The elements of a Monell claim, and the extent to which prosecutors in New York are agents of the state (as opposed to a county) are not inextricably intertwined with the question of absolute immunity. We

34

therefore decline to exercise pendent appellate jurisdiction over these issues at this time.

## CONCLUSION

For the foregoing reasons, the order of the district court insofar as it denied absolute immunity to the three Monroe County prosecutors is reversed, and the case is remanded for further proceedings consistent with this opinion.