Alan **NEWTON**, Plaintiff,

v.

The **CITY OF NEW YORK; District Attorneys Mario Merola and Robert T. Johnson, Individually, and in Their Official Capacities; Andrea Freund and Various John/Jane Does, Individually and in Their Official Capacities As Employees of the City of New York Who Are/Were Assistant District Attorneys Within the Office of the District Attorney, County of Bronx; Detective Joanne Newbert, Detective Phillip Galligan, Detective [John Doe] Hartfield, Detective [John Doe] Ryan, Detective [John Doe] Harris, Police Officer Douglas Leho, Police Officer William Sean O'Toole, Lieutenant Michael Sheehan, Sergeant Patrick J. McGuire, Police Officer [John Doe] Haskins, Police Officer [Jane Doe] Kiely, Inspector Jack J. Trabitz and Various John/Jane Does, Individually and in Their Official Capacities As Employees of the City of New York Who Are/Were Members of the Police Department of the City of New York, Defendants.**

No. 07 Civ. 6211(SAS).

United States District Court, S.D. New York.

Sept. 14, 2010.

Opinion Denying Leave to File Motion for Reconsideration Sept. 21, 2010.

John Francis Schutty III, Esq., Law Office of John F. Schutty, New York, NY, for Plaintiff.

Arthur Gabriel Larkin III, Fred Michael Weiler, Assistant Corporation Counsel, The New York City Law Department, New York, NY, for Defendants.

## *OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge:

## I. INTRODUCTION

Alan Newton was released from prison on July 6, 2006, after serving more than twenty-two years for a rape and assault that DNA testing ultimately proved he did not commit. In 1988, Newton sought and was granted permission to test the rape kit containing the exonerating DNA evidence. This never happened. Instead, Patricia Ryan, a laboratory scientist employed by the Office of the Chief Medical Examiner of the City of New York ("OCME")—rather than an independent laboratory—conducted the required forensic analysis. Ryan did not detect the presence of any sperm in the biological fluid samples taken from the victim, and thus could not rule out Newton as the attacker. Subsequent tests performed on the rape kit in 2006 and 2010, however, identified ample amounts of sperm and were able to conclusively establish Newton's innocence.

Newton has since brought a civil rights action against the City for his erroneous conviction, and asserts constitutional claims against Ryan for her alleged role in defendants' investigation, prosecution, and subsequent failure to examine exculpatory evidence.[1] Newton also alleges a state law claim for malicious prosecution against the City based on Ryan's alleged misconduct. Defendants now seek Ryan's dismissal from the case on the basis of governmental immunity, and alternatively, on the merits.[2] For the reasons that follow, defendants' motion is granted in its entirety.

---

1. On October 13, 2009, Ryan was dismissed from the suit on the basis of qualified immunity, because Newton's constitutional right to access the rape kit for DNA testing had not been clearly established at the time of her actions. *See Newton v. City of New York*, No. 07 Civ. 6211, 2009 WL 3294996 (S.D.N.Y. 2009), *withdrawn on reconsideration and amended January 27, 2010*. In a conference held on July 23, 2010, Ryan was putatively reinstated as a defendant based on newly discovered evidence alleged by plaintiff, with a final decision subject to the briefed motion to dismiss the reinstated claims.

Defendants allege that plaintiff has failed to demonstrate newly discovered evidence so as to merit reinstatement of his claims. Because I find that Ryan's damages liability is precluded by governmental immunity even when the alleged newly discovered evidence is taken into account, I do not address this argument.

2. In addition to challenging Newton's claims against Ryan on the merits or on the basis of immunity, defendants also seek dismissal of

## II. FACTS[3]

### A. Overview

In the early morning hours of June 23, 1984, a woman known as V.J.[4] was raped, robbed, and assaulted in the area of Crotona Park, in the Bronx.[5] Shortly thereafter, V.J. was taken to Jacobi Hospital for a physical examination, which included the use of a "Vitullo rape kit" to collect and store biological evidence gathered from V.J.'s body.[6] The rape kit contained pubic and head hair, as well as three cotton swabs and four microscope slides with body fluids.[7] No tests were conducted to determine the assailant's blood type from the semen collected in the rape kit, or to compare the enclosed hairs with those of the victim or Newton.[8] Accordingly, Newton was not connected to V.J.'s assault by any physical evidence.[9]

At trial, Newton presented two witnesses to support his assertion of an alibi.[10] On May 21, 1985, Newton was convicted by a jury of raping, assaulting, and robbing V.J. on the basis of eyewitness testimony and V.J.'s identification of him as her assailant.[11] On May 31, 1985, the court sentenced Newton to concurrent prison terms of 8 1/3 to 25 years for the rape and robbery charges, followed by a consecutive prison term of 5 to 15 years for the assault.[12] Twenty-two years later, DNA evidence exonerated Newton and his conviction was vacated.[13]

### B. Testing the Rape Kit

Newton first requested testing on the rape kit on or about January 29, 1988, in a motion filed with the Supreme Court of the State of New York, Bronx County.[14] At the time, Newton asked for an independent laboratory test to determine whether semen collected from V.J.'s person and clothing was produced by a "secretor" or a "non-secretor," and thereafter determine if Newton was a match.[15] On April 6, 1988, Justice Burton Roberts granted Newton's

---

these claims as a sanction warranted under Rule 37(b) for Newton's failure to comply with a July 23, 2010 Court Order directing him to produce his blood type and secretor status to defendants.

3. The facts in this section are not in dispute and are drawn from the evidence submitted to this Court with respect to previous motions, including declarations and exhibits, and Newton's Amended Complaint ("Am. Compl."). Only the facts relating to this motion have been included. Additional facts were summarized in this Court's January 27, 2010 Amended Opinion and Order. *See Newton v. City of New York*, 681 F.Supp.2d 473, 476–84 (S.D.N.Y.2010).

4. The victim's full name is withheld pursuant to New York's rape shield law.

5. *See* Am. Compl. ¶¶ 36–37. The overall attack consisted of two incidents: rape and sodomy in an outdoor park area, followed by rape, assault, and robbery in an abandoned building. *See id.* ¶ 94.

6. *See id.* ¶ 53.

7. *See* 7/30/84 Police Laboratory Analysis Report, Ex. 0 to 4/23/09 Declaration of John Schutty ("Schutty Decl. I"), plaintiff's counsel, submitted with plaintiff's opposition to defendants' 4/09/09 Motion for Partial Summary Judgment.

8. *See* Am. Compl. ¶ 53.

9. *See id.* ¶ 88.

10. *See id.* ¶ 82.

11. *See id.* ¶ 37. While Newton was convicted of the assault in the abandoned building, he was acquitted of the assault in the outdoor park area. *See id.* ¶ 94.

12. *See id.* ¶ 95.

13. *See id.* ¶¶ 39–40.

14. *See* 6/25/09 Declaration of Alan Newton ("Newton Decl."), ¶ 8.

15. *See id.*

request and authorized inspection of the rape kit "for the purpose of determining whether scientific testing could be performed."[16] If the examination yielded sufficient biological data to complete a serological analysis, the Court allowed Newton to apply for a further Order "directing the New York State Department of Corrections to make arrangements" as necessary.[17] Judge Roberts ordered Mario Merola, the then-District Attorney of Bronx County, to "secure and deliver" the rape kit to the Medical Examiner of the City of New York, where an independent laboratory and doctor could conduct the first phase of the testing.[18] For unknown reasons, on July 27, 1988, the rape kit was given to Ryan—an employee of the OCME—for analysis,[19] rather than to Newton's expert Dr. Robert Shaler, who was named in Judge Roberts' Order.[20]

On September 2, 1988, Ryan provided a written report stating that the there was insufficient semen in the rape kit to complete the requested tests.[21] Ryan noted that she did not observe any sperm on either the slides or within the swabs; "Samples analyzed gave negative enzymatic, microscopic, and immunological test for the presence of semen [on the swabs created by the hospital] .... Microscopic analy-

sis [on the slides] did not show the presence of spermatozoa."[22] Thereafter, the rape kit was returned to storage at the Property Clerk Division of the New York City Policy Department ("NYPD"), where it was subsequently misplaced until 2005.[23] When the rape kit was finally re-located, it was submitted to the OCME's Department of Forensic Biology for DNA testing, and the evidence was divided to enable testing by an independent laboratory.[24] The results of this testing, completed by the OCME in March 2006 and by the independent laboratory in April 2006, led to Newton's exoneration on July 6, 2006.[25]

## C. Discovery of Ryan's Error

In anticipation of trial, Newton's counsel secured a court order on May 28, 2010 that required defendants to produce the rape kit for testing to Newton's expert forensic scientist, Dr. Edward Blake.[26] Dr. Blake's examination yielded a surprising discovery—"readily visible ... intact ... and abundant spermatozoa" on the slides found in the rape kit.[27] Dr. Blake determined that the quantity and condition of the samples made them "more than adequate for a successful ... DNA typing analysis,"[28] thus purportedly rendering "Ryan's examination of the hospital slides ... ineffective

16. 4/6/88 Order of Judge Roberts, Ex. A to 6/26/09 Declaration of John Schutty ("Schutty Decl. II").

17. Id.

18. See id.

19. See 3/31/09 Deposition of Patricia Ryan, OCME laboratory director, Ex. O to Schutty Decl. ("Ryan Dep."), at 69.

20. See 4/6/88 Order of Justice Roberts, Ex. D to 8/4/10 Declaration of Arthur G. Larkin in Support of Defendants' Motion to Dismiss and/or Preclude and/or Reconsideration of all Reinstated Claims ("Larkin Decl.").

21. See Am. Compl. ¶ 100.

22. See 9/2/88 Serology Laboratory Report by Patricia Ryan, Ex. I to 8/13/10 Declaration of John Schutty ("Shutty Decl. III").

23. See Am. Compl. ¶¶ 136, 139.

24. See id. ¶ 139.

25. See id.; see also 7/6/06 Order of Justice John J. Byrne.

26. See 5/28/10 Order [Docket No. 140].

27. 7/19/10 Declaration of Dr. Edward Blake, Ex. G to Schutty Decl. III, at ¶¶ 36, 47.

28. Id. at ¶ 37.

and reckless" or perhaps implying "that she never examined the slides" at all.[29]

### D. Claims

Based on the new evidence presented by Dr. Blake, this Court reinstated three causes of action in Newton's Amended Complaint, which alleged three federal civil rights claims against Ryan directly, as well as a state law claim against the City based on Ryan's alleged misconduct.[30] Specifically, Newton asserted three causes of action involving Ryan, alleging: (1) Section 1983 claims based on a loss of evidence; (2) Section 1985 claims based on a civil rights conspiracy to violate Newton's rights; and (3) Section 1983 claims for malicious prosecution against Ryan individually, with a corresponding state law claim against the City based on Ryan's employ.[31] These claims were previously dismissed on the basis of qualified immunity, but are reexamined here in consideration of the facts that have since emerged. Defendants argue that the rationale of immunity, either qualified or absolute, is still warranted and that the claims against Ryan must be permanently dismissed.

## III. APPLICABLE LAW

### A. Motion to Dismiss

When reviewing a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept as true all of the factual allegations contained in the complaint"[32] and "draw all reasonable inferences in the plaintiff's favor."[33] However, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness."[34] To survive a Rule 12(b)(6) motion to dismiss, the allegations in the complaint must meet a standard of "plausibility."[35] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[36] Plausibility "is not akin to a probability requirement;" rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[37] Pleading a fact that is "merely consistent with a defendant's liability" does not satisfy the plausibility standard.[38]

When determining the sufficiency of a claim under Rule 12(b)(6), the court is normally required to consider only the allegations in the complaint. However, the court is allowed to consider documents outside the pleading if the documents are integral to the pleading or subject to judicial notice.[39]

### B. Immunity From Federal Causes of Action

 "[G]overnment officials are entitled to some form of immunity from suits

---

**29.** *Id.* at ¶ 52.

**30.** *See* 7/30/10 Order [Docket No. 143].

**31.** *See* Am. Compl. ¶¶ 166–175, 212–218, 238–246.

**32.** *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 572, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). *Accord Rescuecom Corp. v. Google Inc.,* 562 F.3d 123, 127 (2d Cir.2009).

**33.** *Ofori–Tenkorang v. American Int'l Group, Inc.,* 460 F.3d 296, 298 (2d Cir.2006).

**34.** *In re NYSE Specialists Sec. Litig.,* 503 F.3d 89, 95 (2d Cir.2007) (quotation marks omitted).

**35.** *Twombly,* 550 U.S. at 564, 127 S.Ct. 1955.

**36.** *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quotation marks omitted).

**37.** *Id.* (quotation marks omitted).

**38.** *Id.* (quotation marks omitted).

**39.** *See Global Network Commc'ns, Inc. v. City of N.Y.,* 458 F.3d 150, 156 (2d Cir.2006).

for damages. As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability."[40] Actions brought under Section 1983 are to be read "in harmony with general principles of tort immunities and defenses rather than in derogation of them."[41] The form of immunity to which a public employee is entitled "turns on the kind of function the employee is fulfilling in performing the acts complained of."[42]

## 1. Absolute Immunity

■ Absolute immunity gives "public officials entrusted with sensitive tasks a protected area of discretion within which to carry out their responsibilities."[43] Specifically, "judges, prosecutors, and other persons acting 'under color of law' who perform official functions in the judicial process" are fully protected "from liability for their judicial acts."[44] As Justice Byron White articulated many years ago:

> The reasons for this rule are ... substantial. It is precisely the function of a judicial proceeding to determine where the truth lies. The ability of courts, under carefully developed procedures, to separate truth from falsity, and the importance of accurately resolving factual disputes in criminal (and civil) cases are

such that those involved in judicial proceedings should be given every encouragement to make a full disclosure of all pertinent information within their knowledge.[45]

■ The Supreme Court has recognized three factors that must be addressed in determining whether a government official should be accorded absolute immunity for a particular function: (1) whether a historical or common law basis exists for immunity from suit arising out of performance of the function; (2) whether performance of the function poses obvious risks of harassing or vexatious litigation against the official, and (3) whether there exist alternatives to damage suits against the official as a means of redressing wrongful conduct.[46] Because "absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity," accusations of malice or corruption do not disturb its protections.[47]

■ "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question."[48] The Supreme Court has been "quite sparing" in its recognition of absolute immunity, because "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect

**40.** *Harlow v. Fitzgerald,* 457 U.S. 800, 806, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *Accord Cornejo v. Bell,* 592 F.3d 121, 124, 127 (2d Cir.2010).

**41.** *Burns v. Reed,* 500 U.S. 478, 486, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991).

**42.** *Cornejo,* 592 F.3d at 127.

**43.** *Barr v. Abrams,* 810 F.2d 358, 361 (2d Cir.1987).

**44.** *Briscoe v. LaHue,* 460 U.S. 325, 335, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). *Accord Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (noting that prosecutors are entitled to absolute immunity

because their prosecutorial activities are "intimately associated with the judicial phase of the criminal process, and thus [are] functions to which the reasons for absolute immunity apply with full force.").

**45.** *Briscoe,* 460 U.S. at 335, 103 S.Ct. 1108 (citations omitted).

**46.** *See Mitchell v. Forsyth,* 472 U.S. 511, 521–23, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

**47.** *Imbler,* 424 U.S. at 419 n. 13, 96 S.Ct. 984.

**48.** *Burns,* 500 U.S. at 486, 111 S.Ct. 1934.

government officials in the exercise of their duties." [49]

## 2. Qualified Immunity

■■■ For public officials outside the purview of absolute immunity, "the protection takes the form of 'qualified immunity,' *i.e.,* immunity from liability if the employee was acting in subjective and objective good faith." [50] "Qualified immunity is an affirmative defense designed to protect the defendant public official not just from liability but also from suit thereby sparing him the necessity of defending by submitting to discovery on the merits or undergoing a trial." [51] In all cases, the qualified immunity analysis mandates a fact-specific inquiry.

■■■ "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." [52] A discretionary function "involves an element of judgment or choice," such that the activity at issue does not have a predetermined outcome. [53] A government official engaged in ministerial "conduct that is not the product of independent judgment will be unaffected by threat of liability" and is therefore not protected by immunity doctrines. [54]

■■■ The inquiry as to whether an eligible government official is entitled to qualified immunity is two-fold. One, the court "must decide whether the facts that a plaintiff has alleged make out a violation of a constitutional right." [55] Two, "the court must decide whether the right as issue was clearly established at the time of the defendant's alleged misconduct." [56] Courts have "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." [57]

The Second Circuit has held that a right is clearly established for qualified immunity purposes if "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." [58] " 'Unless the plaintiff's allegations state a

---

49. *Id.*

50. *Id.*

51. *Amore v. Novarro,* 610 F.3d 155, 161 (2d Cir.2010) (quotation and alterations omitted). *Accord Jenkins v. City of New York,* 478 F.3d 76, 87 n. 9 (2d Cir.2007) ("[Qualified immunity] is 'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.' " (quoting *Forsyth,* 472 U.S. at 526, 105 S.Ct. 2806)).

52. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

53. *Berkovitz by Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988).

54. *Id.*

55. *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 815–816, 172 L.Ed.2d 565 (2009).

56. *Id.* at 816 (quotation omitted).

57. *Id.* at 818. *Pearson* recognized, however, that the traditional sequence "is often appropriate." *Id.*

58. *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003) (quotation omitted). *Accord Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.").

Despite the Supreme Court's clear directive, the Second Circuit has not been consistent in regards to the circumstances under which a governmental officer is entitled to qualified immunity. *Compare Manganiello v. City of New York,* 612 F.3d 149, 164 (2d Cir.2010) (recognizing a third condition un-

claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal.' " [59]

## IV. DISCUSSION

### A. Absolute Immunity

#### 1. Prong One: Historical or Common Law Support for Immunity

The first factor identified by the Supreme Court in determining whether absolute immunity protects a government official's discretionary determination is "[t]he absence of historical or common-law support—either direct or by analogy—for cloaking the challenged actions with absolute immunity." [60] This factor is "generally determinative." [61] Thus, I begin by considering whether Ryan's conduct was of the type traditionally protected by common law immunity.

Because there is no direct historical precedent involving the immunity of a forensic scientist tasked with testing biological evidence in a proceeding collateral to a criminal conviction, the court "may look by analogy to the historic or common law immunity granted to other figures within the judicial process." [62] "As a general principle, government [officials] are entitled to absolute immunity when functioning as an advocate of the state in a way that is intimately associated with the judicial process." [63] Based on this reasoning, courts have extended a "cluster of immunities [to protect] the various participants in judge-supervised trials," including: wit-

---

der which qualified immunity is triggered: "A government official sued in his official capacity is entitled to qualified immunity (1) if the conduct attributed to him is not prohibited by federal law; or (2) where that conduct is so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time of the conduct; *or (3) if the defendant's action was objectively legally reasonable ... in light of the legal rules that were clearly established at the time it was taken.*" (quotations and citations omitted) (emphasis added)) *with Okin v. Village of Cornwall–On–Hudson Police Dept.*, 577 F.3d 415, 433 n. 11 (2d Cir.2009) ("[O]nce a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for a police officer who violated this clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful."). *Accord Amore*, 610 F.3d at 162 (recognizing tension in the case law as to "[w]hether the 'objectively reasonable' inquiry is framed as part of the 'clearly established' inquiry, or apart from it ...."). Because the Supreme Court has made clear that the qualified immunity test consists only of two prongs, I will not consider the reasonableness of defendants' conduct here. *See, e.g., Walczyk v. Rio*, 496 F.3d 139, 165 (2d Cir.2007) (Sotomayor, J., concurring) ("I write separately to call the Court's attention to our collective failure to harmonize our qualified immunity analysis

with the Supreme Court's directives."). *Accord Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir.2009) ("[W]e adopt the [Supreme] Court's two-part test and abandon our previous usage of a three-step analysis.").

**59.** *Scott v. Fischer*, 616 F.3d 100, 110 (2d Cir.2010) (*quoting Forsyth*, 472 U.S. at 526, 105 S.Ct. 2806).

**60.** *Mangiafico v. Blumenthal*, 471 F.3d 391, 395 (2d Cir.2006).

**61.** *Id.*

**62.** *Id.* at 396. *Accord Cornejo*, 592 F.3d at 127 ("While any analogy between two kinds of executive employees is never perfect, such reasoning by analogy is at the heart of judicial thinking: things that are essentially alike should be treated the same.").

**63.** *Mangiafico*, 471 F.3d at 396. Although I utilize the term "absolute immunity" here, courts have often referenced the same concept under the title of "quasi-judicial immunity" when applied to actors other than judges. *See, e.g., Imbler*, 424 U.S. at 420, 96 S.Ct. 984 (noting that courts "sometimes have described the prosecutor's immunity as a form of 'quasi-judicial' immunity and referred to it as derivative of the immunity of judges," who were the original beneficiaries of absolute immunity).

nesses;[64] grand jurors;[65] jurors;[66] prosecutors;[67] sheriffs;[68] coroners;[69] court reporters;[70] clerks of the court;[71] bailiffs;[72] town licensing board members,[73] social workers,[74] and arbitrators.[75] The common feature amongst these disparate actors is their involvement in actions "integral to an on-going 'judicial phase' of a prosecution" or other adversarial proceeding.[76] Whether or not their participation occurred in court or in a post-conviction context is not dispositive in an immunity inquiry.[77]

There is no question that Ryan—as a forensics scientist charged with testing the evidence against Newton—was "intimately associated with the judicial phase of the criminal process."[78] The determination of guilt is perhaps *the* defining characteristic

of the criminal process,[79] and the serological analysis at issue was specifically intended as a gateway to demonstratively inculpate or exculpate Newton for the crime of which he had been convicted. If the results had indicated that further scientific testing was possible, the state court authorized "such procedures as . . . necessary" to make a conclusive determination.[80] Indeed, as plaintiff alleges, Ryan's findings were instrumental in determining the state's position on Newton's continued confinement.[81]

Although Ryan's job was ostensibly to provide a neutral assessment of forensic data, her functional role cannot be ascertained on the basis of her "discrete actions."[82] Instead, the determination of

64. *See, e.g., Briscoe,* 460 U.S. 325, 103 S.Ct. 1108.

65. *See, e.g., Turpen v. Booth,* 56 Cal. 65 (1880).

66. *See, e.g., White v. Hegerhorst,* 418 F.2d 894 (9th Cir.1969).

67. *See, e.g., Imbler,* 424 U.S. 409, 96 S.Ct. 984.

68. *See, e.g., Doe v. McFaul,* 599 F.Supp. 1421 (N.D.Ohio 1984).

69. *See, e.g., Lambert v. Garlo,* 19 Ohio App.3d 295, 484 N.E.2d 260 (1985).

70. *See, e.g., Brown v. Charles,* 309 F.Supp. 817 (E.D.Wis.1970).

71. *See, e.g., Wiggins v. New Mexico State Supreme Court Clerk,* 664 F.2d 812 (10th Cir. 1981).

72. *See, e.g., Martin v. Hendren,* 127 F.3d 720, 722 (8th Cir.1997).

73. *See, e.g., Dotzel v. Ashbridge,* 438 F.3d 320, 323, 324, 327 n. 5 (3d Cir.2006).

74. *See, e.g., Vosburg v. Dep't of Soc. Servs.,* 884 F.2d 133, 135–38 (4th Cir.1989).

75. *See, e.g., Austern v. Chicago Bd. Options Exch.,* 898 F.2d 882, 886 (2d Cir.1990).

76. *Warney v. Monroe County,* 587 F.3d 113, 121 (2d Cir.2009).

77. *Id.* at 123 (extending prosecutorial immunity to post-conviction collateral proceedings and noting that while the prosecutor's "functions may be somewhat administrative [at this stage], and may not always relate to in-court advocacy," they nonetheless are often "integral to an an-going judicial phase of a prosecution"). *Id.* at 121. *Accord Parkinson v. Cozzolino,* 238 F.3d 145, 150 (2d Cir.2001).

78. *Imbler,* 424 U.S. at 430–31, 96 S.Ct. 984.

79. *See id.* at 426, 96 S.Ct. 984 ("Attaining the [criminal justice] system's goal of accurately determining guilt or innocence . . . .").

80. 4/6/88 Order of Justice Roberts, Ex. D to Larkin Decl.

81. *See* Plaintiff's Trial Brief ("Pl. Tr. Br."), at 2 ("[P]laintiff will prove that his continued, wrongful imprisonment was the product of a false lab report maliciously forwarded to the District Attorney by defendant Patricia Ryan.").

82. *Warney,* 587 F.3d at 123. *See also infra* Part IV.B.1 (discussing the subjectivity inherent in the process of forensic analysis).

whether her actions implicate her investigatory or advocacy capacity necessarily relies on "their role and function in an ongoing proceeding." [83] As the Second Circuit has opined, "[u]nless the DNA testing is considered with reference to context, it is impossible to classify functionally." [84] Here, the testing of the rape kit was "integral to and subsumed in the advocacy functions being performed in connection with [Newton's] post-conviction initiatives." [85] Ryan's analysis was conducted for the sole purpose of determining whether *Newton's* continued incarceration was necessarily warranted, not for a general purpose investigation to identify potential suspects in V.J.'s attack. Indeed, "[t]he DNA testing obviously would have bearing on the advocacy work of deciding whether to oppose [Newton's] initiatives" to vacate his conviction.[86]

■ To this end, in *Warney v. Monroe County*, the Second Circuit made clear that prosecutors would be fully insulated from liability for their administrative or investigative role in submitting DNA evidence for postconviction testing.[87] The court reasoned that because the results of the testing would affect the outcome of the proceedings against a defendant, they necessarily implicate an advocacy function.[88] Because "absolute immunity ... extends to non-prosecutor officials when they are performing 'functions analogous to those of a prosecutor[,]'" [89] Ryan is entitled to the same protections for her conduct as the state's advocate in Newton's post-conviction proceedings. That her findings could have led to Newton's exculpation does not undermine the adversarial nature of her position: a prosecutor is similarly expected to seek truth above all, and to disclose information that may exonerate a defendant. The Second Circuit has confirmed that "[t]he advocacy function of a prosecutor includes seeking exoneration and confessing error to correct an erroneous conviction." [90] Thus, while forensic analysis may sometimes be viewed as an investigatory activity, here it served as an advocacy tool.

■ In any event, plaintiff does not contest the 'advocacy' categorization of Ryan's functional role. To the extent that plaintiff challenges Ryan's entitlement to absolute immunity, he posits that she was not a quasi-judicial officer because "she was not appointed by the court and she was not authorized to conduct any testing." [91] The basis for plaintiff's assertion is that the court order "authorized testing by a forensic scientist retained by Mr. Newton's attorneys ... [The Judge] did not appoint his own expert." [92] Yet absolute immunity is "justified and defined by the functions it protects and serves, not by the person to whom it attaches," [93] and as plaintiff concedes, Ryan was "undeniably

---

83. *Warney*, 587 F.3d at 123.

84. *Id.* ("If the testing inculpated [the criminal defendant], it would be a potent tool of the advocacy; if it exculpated [him], it might be deemed administrative, in the sense that it would entail disclosure; if it inculpated someone else, it would be investigative, at least to the extent that it might identify the real killer.").

85. *Id.*

86. *Id.*

87. *See id.*

88. *See generally id.*

89. *Cornejo*, 592 F.3d at 127 (quoting *Butz v. Economou*, 438 U.S. 478, 515, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)).

90. *Warney*, 587 F.3d at 125.

91. 8/4/10 Plaintiff's Sur–Reply Memorandum of Law Filed in Opposition to Defendants' Motion "For Preclusion and/or Dismissal of Reinstated Claims, and for Reconsideration" ("Pl. Sur–Rep."), at 3.

92. *Id.*

93. *Forrester v. White*, 484 U.S. 219, 227, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988).

acting within the scope of her duty as an OCME laboratory scientist in testing the rape kit pursuant to court order." [94] Indeed, in plaintiff's words, "Ms. Ryan was employed by the OCME specifically to conduct such tests and produce the type of report that is in issue in this matter. Particularly after a court issued order, Ms. Ryan's report was foreseeable and the natural incident of her employment." [95] Because Ryan was acting as an arm of the state in conducting the testing, it is irrelevant that she was not acting as a court-appointed expert. As the Second Circuit has stated, "the critical inquiry is not the official position of the person seeking absolute immunity, but the specific action for which the person seeks immunity." [96] Thus, in view of the context in which Ryan conducted forensic testing of the rape kit, as well as the specific and individualized purpose of the testing in Newton's criminal case, the first and most important factor of the absolute immunity inquiry favors Ryan's protected status.

### 2. Prong Two: Public Policy Considerations

The public policy prong of the three-factor immunity test also counsels in favor of granting absolute immunity to Ryan. If laboratory scientists were exposed to liability on the basis of their alleged forensic testing errors, every criminal case involving biological evidence would become a breeding ground for additional litigation against the state and its actors. Because Section 1983 lawsuits against forensics examiners "could be expected with some frequency" as defendants "transform resentment at being convicted into allegations" of improper scientific analysis, the "concern that harassment by unfounded litigation would cause a deflection of the [official's] energies from his public duties" is directly implicated. [97] After all, a defendant receiving unfavorable forensic results can be expected to be disgruntled. As the Supreme Court has noted, "if the defendant official could be made to answer in court each time a disgruntled defendant charged him with wrongdoing, his energy and attention would be diverted from the pressing duty of enforcing the criminal law" or otherwise facilitating the criminal justice process. [98] The primary purpose underlying the long-standing tradition of absolute immunity for judges, prosecutors, and witnesses thus applies with equal force to forensic scientists—the ability to "perform their respective functions without harassment or intimidation." [99]

Exposure to suit may yield other unfavorable public policy results. While laboratory scientists are compelled to comply

---

94. Pl. Tr. Br. at 14. Plaintiff's assertion about the scope of Ryan's professional duties belies his only other argument against affording her absolute immunity. Plaintiff argues that "[e]ven if this Court were to make a stretch and deem Patricia Ryan a quasi-judicial officer, under New York law her actions still lack any colorable claim of authority and do not entitle her to immunity." Pl. Sur. Rep. at 3. However, absolute immunity still applies where conduct occurred in *excess* of jurisdiction, rather than the absence of it. *See, e.g., Mireles v. Waco*, 502 U.S. 9, 13, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991) ("If judicial immunity means anything, it means that a judge 'will not be deprived of immunity because the action he took was in error ... or was in excess of his authority.' ") (quotation omitted). Because Newton accepts that Ryan had general authority to conduct such tests at the OCME, he can only argue that she exceeded her jurisdiction, thus leaving her immunity protection intact.

95. Pl. Tr. Br. at 14.

96. *Mangiafico*, 471 F.3d at 394.

97. *Briscoe*, 460 U.S. at 343–44, 103 S.Ct. 1108 (citations omitted)

98. *Id.* (citations omitted).

99. *Butz*, 438 U.S. at 512, 98 S.Ct. 2894.

with court orders requiring their services, other public officials may be less inclined to grant permission for post-conviction testing if doing so may invite the "the threat of a protracted lawsuit, not to mention the prospect of money damages, [that] would inevitably involve the diversion of the government's attention and resources."[100] At the very least, "[t]he defense of such suits would necessarily complicate, if not intimidate, the making of what may be routine, discretionary decisions by judges and prosecutors."[101] Moreover, the "finality of judgments"— identified by the Supreme Court as part of the foundational rationale for absolute immunity[102]—would be compromised, and respect for the criminal justice process eroded, as defendants second-guessed the integrity of the scientific testing used to convict them or justify their confinement, even after their guilt had already been subject to the safeguards of trial and determined by an impartial jury. As the Supreme Court has noted, "[t]he loser in one forum will frequently seek another."[103]

### 3. Prong Three: Alternative Means of Redress

The third factor in the absolute immunity inquiry, the existence of other remedies against laboratory scientists, is also satisfied. State medical examiners and forensics scientists are subject to professional disciplinary action, which has been "considered sufficient in previous cases affording absolute immunity."[104] Additionally, the public is not left "powerless to deter misconduct or to punish that which occurs," because the criminal law could respond to "willful deprivations of constitutional rights."[105]

100. *Mangiafico,* 471 F.3d at 397. The Supreme Court has held that prisoners do not have a constitutional right to post-conviction DNA testing. *See District Attorney's Office for the Third Judicial District v. Osborne,* —— U.S. ——, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009). New York's subdivision 1–a to New York Criminal Procedure Law section 440.30 ("section 440.30(1–a)(a)"), enacted in 1994, permits a post-conviction defendant to "request the performance of a forensic DNA test on specified evidence" when moving to vacate a judgment. While the request "shall" be granted upon a court's "determination that if a DNA test had been conducted on such evidence, and if the results had been admitted in the trial resulting in the judgment, there exists a reasonable probability that the verdict will have been more favorable to the defendant," there is still a measure of judicial discretion involved in a defendant's post-conviction right to access evidence. N.Y.Crim. Proc. L. § 440.30(1–a)(a). *See, e.g., Fuentes v. Superintendent, Great Meadow Corr. Facility,* No. 04 Civ. 0737, 2009 WL 2424206, at *9 (E.D.N.Y. Aug. 5, 2009) (finding no procedural due process violation in light of *Osborne* where state court denied post-conviction defendant's request for access to evidence for DNA testing under section 440.30(1–a)(a) upon the state court's determination that the defendant had failed to show the requisite reasonable probability).

Moreover, New York has no law requiring the preservation of evidence, a fact which could unfortunately serve to circumvent the spirit of section 440.30(1–a)(a). The fear of continuous litigation in the wake of post-conviction testing may encourage the use of this evidentiary loophole. It may also dampen prosecutorial enthusiasm in helping post-conviction defendants access the evidence. Indeed, Newton's rape kit would not ultimately have been found were it not for Bronx Assistant District Attorney Elisa Koenderman's personal request that officials at the city storage facility conduct another search and her inclusion of the information identifying its location "for [their] convenience." 7/14/05 Letter from ADA Koenderman to Trabitz, Ex. H to Schutty Decl. I.

101. *Mangiafico,* 471 F.3d at 397.

102. *Forrester,* 484 U.S. at 225, 108 S.Ct. 538.

103. *Briscoe,* 460 U.S. at 335, 103 S.Ct. 1108.

104. *Mangiafico,* 471 F.3d at 397 n. 4.

105. *Imbler,* 424 U.S. at 428–29, 96 S.Ct. 984. "This Court has never suggested that the poli-

### 4. Analysis

Taken as a whole then, the circumstances of the instant case support absolute immunity for Ryan. Certainly, the extension of absolute immunity to laboratory scientists presents the supremely difficult task of balancing the equities between the public good and individual rights, with "evils inevitable in either alternative."[106] "To be sure, this immunity does leave the genuinely wronged defendant without civil redress against a[n officer] whose malicious or dishonest action deprives him of liberty."[107] For this reason, the protection of absolute immunity may not be appropriate in a pre-conviction context where the jury's determination of guilt may result from a faulty scientific process, and where the laboratory scientist's role is primarily an investigative one.

But these are not the circumstances presented here. Newton had an opportunity to assert his innocence at trial. He presented two alibi witnesses to testify on his behalf and successfully convinced the jury to acquit him of one of the incidents of rape with which he was charged.[108] Biological evidence played no role in his initial conviction.

Ryan's role in his prolonged incarceration resulted from her participation in a court ordered post-conviction adversarial proceeding, as a state advocate engaged in a search for the truth—thus satisfying "the ultimate question" for the grant of full immunity.[109] The general characteristics of her profession only lend credence to the need for absolute immunity. Under these circumstances, "the alternative of qualifying [her] immunity would disserve the broader public interest."[110] As the Supreme Court has underscored, "the claims of the individual must yield to the dictates of public policy, which requires that the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible."[111]

### B. Qualified Immunity

#### 1. Role of Judgment in Forensic Analysis

■ Even assuming, *arguendo*, that Ryan is not entitled to absolute immunity, she is shielded by the doctrine of qualified immunity. As a threshold matter, Newton argues that Ryan's actions were not discretionary, and that she is therefore not eligible for qualified immunity. In support of his contention, Newton offers one conclusory assertion: "There is simply no factual basis for arguing that Patricia Ryan had the 'discretion' to 'act in the shoes of [the named doctor on the court order] and report findings that were patently false.'"[112] Newton misapprehends the discretionary element which triggers quali-

---

cy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law." *Id.* at 429, 96 S.Ct. 984.

**106.** *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949) (Hand, J.) ("As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance, it has been thought better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.").

**107.** *Imbler,* 424 U.S. at 427–28, 96 S.Ct. 984.

**108.** *See* Am. Compl. ¶¶ 82, 94.

**109.** *Warney,* 587 F.3d at 121.

**110.** *Imbler,* 424 U.S. at 427–28, 96 S.Ct. 984.

**111.** *Briscoe,* 460 U.S. at 332–33, 103 S.Ct. 1108 (quotation omitted). *Cf. Pierson v. Ray,* 386 U.S. 547, 553–54, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) ("[Judicial] immunity applies even when the judge is accused of acting maliciously and corruptly, and it is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of the consequences.").

**112.** Pl. Sur. Rep. Br. at 4.

fied immunity. Newton's constitutional grievance against Ryan lies with her failure to properly examine the slides—not in the fact that she examined them.

To the extent that Newton asserts constitutional claims arising out of the City's misdelivery of the rape kit to the wrong doctor, he necessarily does so against the City—Ryan was not, by any account, responsible for the procedural error in the delivery. Her alleged misconduct is limited to the faulty examination or misreporting regarding the absence of sperm on the slides, and her eligibility for qualified immunity depends only on whether this particular act required an exercise of judgment. Moreover, whether or not Ryan was malicious or incompetent in not identifying the semen on the slides has no bearing on the question of whether her act of examining them necessarily entailed a measure of judgment so as to leave open the *possibility* of a qualified immunity analysis.

That Ryan exercised discretionary judgment is underscored by the Supreme Court's recent holding in *Melendez–Diaz v. Massachusetts*, which requires forensic laboratory scientists to testify at the criminal trials for which they handled evidentiary analysis,[113] The Court indicated that

seemingly "neutral scientific testing" is not really quite so "neutral or … reliable," and noted that even the straight-forward methodology used to analyze seized drugs "requires the exercise of judgment and presents a risk of error that might be explored on cross-examination." [114] The Court explained that "[t]he same is true of many of the other types of forensic evidence commonly used in criminal prosecutions" and cited an article "discussing problems of subjectivity, bias, and unreliability of common forensic tests." [115] The Court highlighted its conclusion that "there is wide variability across forensic science disciplines with regard to techniques, methodologies, reliability, types and numbers of potential errors, research, general acceptability, and published material." [116] Certainly the process of forensic testing is not a ministerial act with a definitive outcome—while DNA and biological evidence are precise, they are still handled and interpreted by human beings. The phenomenon of judgment involved in even the most routine medical analysis is evoked by the common refrain that a patient should always obtain a second opinion in regards to any serious diagnosis—even one derived from a seemingly clear x-ray.[117]

113. *Melendez–Diaz v. Massachusetts*, —— U.S. ——, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009) (finding that forensic lab reports are testimonial in nature and subject to the Confrontation Clause, thereby allowing defendants to challenge their validity).

114. *Id.* at 2537.

115. *Id.*

116. *Id.* at 2538 (quoting National Academy Report S–5 and citing 5–9, 5–12, 5–17, and 5–21 of the Report).

117. While the immunity inquiry for federal claims is necessarily separate from that of state law claims, the determination that Ryan was engaged in a discretionary judgment for federal qualified immunity purposes is also instructive in a state law context. *See, e.g., McLean v. City of New York*, 12 N.Y.3d 194, 202, 878 N.Y.S.2d 238, 905 N.E.2d 1167 (2009) ("[D]iscretionary acts may not be a basis of liability: [W]hen official action involves the exercise of discretion, the officer is not liable for the injurious consequences of that action even if resulting from negligence or malice.") (quotation omitted). *See also United States v. City of New York*, 683 F.Supp.2d 225, 269 (E.D.N.Y.2010) ("The New York Court of Appeals has framed the official immunity standard as follows: 'Whether an action of a governmental employee or official is cloaked with any governmental immunity requires an analysis of the functions and duties of the actor's particular position and whether they inherently entail the exercise of some discretion and judg-

## 2. Clearly Established Constitutional Right

Having determined that Ryan was conducting a discretionary function, the ensuing issue for qualified immunity purposes is whether she violated Newton's clearly established constitutional rights when she erred—inadvertently or otherwise—in her analysis of the rape kit. Even accepting Newton's claim that Ryan acted with malice or incompetence, there is still no basis to infer that she violated a clearly established constitutional right.

Newton alleges a violation of his Fifth and Fourteenth Amendment due process rights, as well as a First Amendment claim for denial of his right of access to the courts. Because the First Amendment claim can be summarily dismissed on grounds other than immunity, I begin with a discussion of that claim.

### a. First Amendment Claim

 Defendants argue that Newton's First Amendment claim must be dismissed because it was first raised in his trial brief and opposition in the instant motion, and "submitted less than two months before trial in this three-year old case."[118] In response, Newton refers to two earlier references to a First Amendment claim in his submissions to the Court:

> The very first paragraph of the Amended Complaint states: 'This action arises under the Constitution of the United States, particularly the First, Fourth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States through the Civil Rights Act, Title 42 U.S.C. Sections 1983 and 1988'. In arguing that his constitutional rights were violated, plaintiff previously stated in a memorandum of law filed with this Court that: "Due to 'page limits' imposed by the Court on the lengths of legal briefs . . . we address the Due Process Clauses of the Fifth and Fourteenth Amendments below, while expressly reserving plaintiff's right to assert the other constitutional violations asserted in the Complaint."[119]

Devoting two sentences to a constitutional claim amongst the countless court submissions offered in the course of three years of litigation constitutes abandonment. Defendants are entitled to notice of the specific issues that will be litigated at trial, and two vague allusions to a First Amendment claim, without explication and merely as a vehicle to reserve the right, are insufficient.[120]

---

ment. . . . [G]overnmental immunity . . . [attaches] to those [actions] involving an exercise of that discretion.' ") (quoting *Mon v. City of New York*, 78 N.Y.2d 309, 313, 574 N.Y.S.2d 529, 579 N.E.2d 689 (1991)).

Because I hold that Ryan's actions were discretionary in nature, she is entitled to immunity on Newton's state law claims. *See, e.g., Arteaga v. State*, 72 N.Y.2d 212, 216–217 & n. 1, 532 N.Y.S.2d 57, 527 N.E.2d 1194 (1988) (providing medical examiner as example warranting absolute immunity); *Pertilla v. Genetic Design, Inc.*, 166 Misc.2d 843, 634 N.Y.S.2d 1006 (Sup.Ct. Chenago Co. 1995) (extending full immunity to private laboratory performing DNA tests in a paternity proceeding). *Cf. Hirschfeld v. Spanakos*, 909 F.Supp. 174, 180 (S.D.N.Y.1995) (noting that New York "affords public officials considerably greater protection from individual capacity

suits than the federal doctrine of qualified immunity").

118. Def. Rep. at 13.

119. Pl. Sur. Rep. Br. at 3.

120. *See, e.g., Singleton v. City of Newburgh*, 1 F.Supp.2d 306, 312 (S.D.N.Y.1998) (plaintiff's claim deemed "abandoned" where it was alleged in the complaint but "not raised elsewhere in the record"); *Anti–Monopoly, Inc. v. Hasbro, Inc.*, 958 F.Supp. 895, 907 n. 11 (S.D.N.Y.1997) ("[T]he failure to provide argument on a point at issue constitutes abandonment of the issue . . . which provides an independent basis for dismissal."), *aff'd*, 130 F.3d 1101 (2d Cir.1997); *Spearman v. Dutchess County*, No. 05 Civ. 148, 2008 WL 2945991, at *1 n. 1 (N.D.N.Y. July 25, 2008) (considering the First Amendment claims ref-

Moreover, the sole reference to a First Amendment claim in plaintiff's legal briefs—offered as one of plaintiff's two pieces of evidence that he did in fact assert a First Amendment violation earlier in the litigation—was in a response to defendants' June 5, 2009 motion for summary judgment, which sought dismissal "of all of plaintiff's federal constitutional claims concerning the alleged loss, or non-production, of the rape kit collected from the victim in his criminal case, during the years *1994–2005*." [121] Ryan's involvement in Newton's case was limited to 1988, and this attempt to preserve Newton's First Amendment claim (even if it were sufficient) cannot be

erenced in plaintiff's Complaint abandoned because plaintiff did not provide supporting arguments in his brief); *Kozey v. Quarles*, No. 04 Civ. 1724, 2005 WL 2387708, at *2 (D.Conn. Sept. 28, 2005) (holding that the plaintiff abandoned any First Amendment claims because his "brief d[id] not make any arguments founded upon the First Amendment").

**121.** 5/18/09 Defendants' Memorandum of Law in Support of Their Motion for Partial Summary Judgment Dismissing All Claims Concerning Production of the Rape Kit ("Def. SJ Mem."), at 1 (emphasis added).

**122.** Newton attests that he did not argue any First Amendment claims out of deference to the Court's page limits for party submissions. *See* Pl. Sur. Rep. at 5 ("Due to page limits imposed by the Court on the lengths of legal briefs . . . we address the Due Process Clauses of the Fifth and Fourteenth Amendments below . . .") (quoting 6/26/09 Plaintiff's Memorandum of Law in Opposition to Defendants' Rule 56 Motion for Summary Judgment). I do not credit this explanation. He had no such qualms when he recently submitted six separate memoranda of law, totaling about sixty pages, for his motions *in limine*—despite the Court's limitation of twenty-five pages for legal briefs.

**123.** *See Osborne*, 129 S.Ct. at 2322 (declining due process protection to convicted defendant denied access to DNA evidence: "We are reluctant to enlist the Federal Judiciary in creating a new constitutional code of rules for

applied to Ryan. To hold otherwise would be unfairly prejudicial and unfair to defendants.[122]

### b. The Fifth and Fourteenth Amendment Claims

While post-conviction defendants have no Fifth or Fourteenth Amendment due process rights to DNA testing, they do obtain a due process liberty interest if a state enacts a statute providing post-conviction defendants access to evidence.[123] The Supreme Court has recognized that fundamental fairness requires that once a state creates a statutory right and puts procedures in place to protect that right, those procedures must comport with due process in application.[124] However, New

handling DNA."). *See also Meachum v. Fano*, 427 U.S. 215, 226, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (holding that once a state imposes limitations on its own discretion and requires that a specific standard prevail for decision-making, it creates a liberty interest "regardless of whether the limits stem from statute, rule or regulation"); *Williams v. Town of Greenburgh*, 535 F.3d 71, 75 (2d Cir.2008) ("Liberty interests 'may arise from two sources—the Due Process Clause itself and the laws of the States.'") (quoting *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).

**124.** *See Evitts v. Lucey*, 469 U.S. 387, 399–401, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) (holding that if a state chooses to dismiss an appeal when an incompetent attorney has violated local rules, it may do so only if such action does not intrude upon the client's due process rights, noting that "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause"); *Morrissey v. Brewer*, 408 U.S. 471, 488–89, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (recognizing that states have the responsibility of establishing procedures regarding parole revocation hearings, but that such procedures must comport with "the minimum requirements of due process"); *Goldberg v. Kelly*, 397 U.S. 254, 262, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (recognizing that although a state may choose whether to institute a welfare program, it must operate what-

York did not enact a statute granting Newton the post-conviction right to access evidence until 1994—six years after Ryan's flawed handling of the evidence. Indeed, in *Colon v. Kuhlmann*—decided the same year that Ryan conducted her forensic analysis—the Second Circuit held that a police laboratory test for the presence of sperm on a rape kit slide did not violate the defendant's constitutional rights, even though the test rendered the slide useless for serological analysis and the defendant lacked any alternative biological evidence which could rule him out as the rapist.[125] Consequently, Ryan is entitled to qualified immunity with respect to Newton's federal claims.[126]

## C. Remaining State Law Claim Against the City

■■■ Newton's remaining state law claim against the City for Ryan's alleged misconduct is necessarily precluded by the determination that she acted with discretion.[127] The New York Court of Appeals has explained: "A public employee's discretionary acts—meaning conduct involving reasoned judgment—may not result in the municipality's liability."[128] As discussed at length above, Ryan's forensic analysis did not require "direct adherence to a governing rule or standard with a compulsory result," but involved the exercise of her scientific experience and skill.[129] As such, the City "is not answerable in

---

ever programs it does establish subject to the protections of the due process clause).

**125.** 865 F.2d 29 (2d Cir.1988).

**126.** Because I hold that Ryan is entitled to immunity, I do not consider defendants' merit-based arguments in support of dismissal. For similar reasons, I decline to address defendants' argument that these claims should be dismissed as a sanction pursuant to Rule 37(b)(2) based on Newton's failure to comply with this Court's July 12 Order. *See Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1365 (2d Cir.1991) (upholding severe sanctions when a party disobeys discovery orders preventing disclosures relating to the merits of particular claims). Nonetheless, a brief review of the sanctions issue is useful in order to present and preserve a complete record.

On July 12, 2010, I ordered Newton to provide defendants with his blood type and whether he is or is not a secretor. This information might have been critical to defendants in responding to Newton's First Amendment claim. Depending on the results or such serological testing, it is possible that Newton could not have been ruled out as V.J.'s attacker, based on testing available in 1988—even if Ryan had properly performed such testing. In that event, the alleged mishandling of the testing would have caused no prejudice to Newton and could not have deprived him of his access to the courts.

Newton failed to comply with this Order. During a telephone conference held on September 2, 2010 Newton's counsel admitted that he had not complied with the Order but defended his non-compliance by shifting blame to the City for failing to justify the need for such testing. This was wholly inappropriate. His quarrel was with the Court not with the City. Non-compliance with a legitimate court is not an option. After this conference, Newton immediately had a blood test which identified his blood type as B+ (which made him a possible secretor), but never provided information as to his secretor status. While this Court could dismiss the reinstated claims pursuant to Rule 37(b)(2) based on Newton's failure to comply with a court order, I do not do so on this ground given the important public policy and constitutional issues implicated in Newton's reinstated claims. Moreover, I am confident as to my ruling that the claims against Ryan must be dismissed based on either absolute or qualified immunity. Nonetheless, should this ruling be overturned by a reviewing court, the sanction application would then be entitled to full and serious consideration.

**127.** *See supra* Part III.B.I.

**128.** *Lauer v. City of New York*, 95 N.Y.2d 95, 99, 711 N.Y.S.2d 112, 733 N.E.2d 184 (2000).

**129.** *Tango v. Tulevech*, 61 N.Y.2d 34, 41, 471 N.Y.S.2d 73, 459 N.E.2d 182 (1983).

damages for the injurious consequences of [Ryan's] action." [130]

## V. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the reinstated claims regarding plaintiff's third, sixth, and ninth causes of action is granted. The Clerk of the Court is directed to close this motion (docket no. 145).

SO ORDERED.

### *OPINION AND ORDER*

 On September 15, 2010, plaintiff submitted a letter requesting leave to file a motion for reconsideration of this Court's September 14, 2010 Opinion and Order ("9/14/10 Opinion"). The 9/14/10 Opinion granted defendants' motion to dismiss all of the reinstated claims against

defendant Patricia Ryan ("Ryan") and against the City for Ryan's alleged misconduct on immunity grounds.[1] Motions for reconsideration are governed by Local Civil Rule 6.3 and are committed to the sound discretion of the district court.[2] A motion for reconsideration is appropriate where " 'the moving party can point to controlling decisions or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.' " [3] A motion for reconsideration may also be granted to " 'correct a clear error or prevent manifest injustice.' " [4]

The limitations imposed by Local Civil Rule 6.3 are intended to " 'ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters.' " [5] Local Rule

**130.** *Haddock v. City of New York*, 75 N.Y.2d 478, 554 N.Y.S.2d 439, 553 N.E.2d 987 (1990). Even if Ryan's actions were considered to be exclusively ministerial, Newton would need to demonstrate that the City owes him a special duty that might give rise to municipal liability. *See, e.g., McLean*, 12 N.Y.3d at 202, 878 N.Y.S.2d 238, 905 N.E.2d 1167 ("[D]iscretionary municipal acts may never be a basis for liability, while ministerial acts may support liability only where a special duty is found."). "A special relationship can be formed ... when [a municipality] voluntarily assumes a duty that generates justifiable reliance by the person who benefits from the duty." *Id.* at 199, 878 N.Y.S.2d 238, 905 N.E.2d 1167. Not only has Newton pled no such facts in relation to Ryan, but this Court has already dismissed any cause of action arising from a putative special relationship. *See* 7/16/08 Opinion and Order, 566 F.Supp.2d 256 (S.D.N.Y.2008) (noting that plaintiff has not specified a cause of action stemming from a special relationship claim). Moreover, Newton did not respond to defendants' motion to dismiss his claim against the *City* for Ryan's wrongdoing in his Opposition Brief, and therefore abandoned his claim. To the extent that he acknowledged his ninth cause of action for malicious prosecution at all, he did so only in relation to Ryan directly. *See, e.g., Dineen ex rel. Dineen v. Stramka*, 228 F.Supp.2d 447, 454 (S.D.N.Y.2002) ("We note

at the outset that plaintiff does not address these claims in its opposition papers, enabling the Court to conclude that it has abandoned them.").

**1.** *See* 9/15/10 Letter of John F. Schutty, plaintiff's counsel ("Pl. Ltr."); *Newton v. City of New York*, No. 07 Civ. 6211, 738 F.Supp.2d 397, 400–02, 2010 WL 3584012, at *1 (S.D.N.Y. Sept. 14, 2010).

**2.** *See Patterson v. United States*, No. 04 Civ. 3170, 2006 WL 2067036, at *1 (S.D.N.Y. July 26, 2006) ("The decision to grant or deny a motion for reconsideration is within the sound discretion of the district court.") (citing *McCarthy v. Manson*, 714 F.2d 234, 237 (2d Cir.1983)).

**3.** *In re BDC 56 LLC*, 330 F.3d 111, 123 (2d Cir.2003) (quotation omitted).

**4.** *RST (2005) Inc. v. Research in Motion Ltd.*, 597 F.Supp.2d 362, 365 (S.D.N.Y.2009) (quoting *Virgin Atl. Airways, Ltd. v. National Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir.1992)).

**5.** *Grand Crossing, L.P. v. United States Underwriters Ins. Co.*, No. 03 Civ. 5429, 2008 WL 4525400, at *3 (S.D.N.Y. Oct. 6, 2008) (quoting *S.E.C. v. Ashbury Capital Partners*, No. 00 Civ. 7898, 2001 WL 604044, at *1 (S.D.N.Y.

6.3 must be "narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the Court."[6] Courts have repeatedly been forced to warn counsel that such motions should not be made reflexively to reargue " 'those issues already considered when a party does not like the way the original motion was resolved.' "[7] A motion for reconsideration is not an "opportunity for making new arguments that could have been previously advanced,"[8] nor is it a substitute for appeal.[9]

Plaintiff perceives three deficiencies in the 9/14/10 Opinion. *First,* plaintiff argues that leave for reconsideration should be granted because "the parties never had any opportunity to brief the common-law doctrine of absolute prosecutorial immunity."[10] Plaintiff contends that the doctrine of quasi-judicial immunity was only briefed in the context of New York state law, not under the federal common law upon which it was ultimately granted.[11] However, defendants' reply brief—to which plaintiff was permitted to reply for the specific purpose of addressing the immunity arguments raised—explicitly discusses and advocates for absolute immunity based on federal common law. To underscore the point, the relevant section is aptly titled "Quasi–Judicial Immunity—Federal Law."[12]

The substantive arguments raised by defendants in their reply brief contradict plaintiff's assertion that the federal immunity issue was "never raised by the parties," thus depriving Newton of "any opportunity to brief this question."[13] For example, the last sentence of the section reads, "Applying the 'functional' approach used by the federal courts, we submit that the same result is warranted under federal law; Patricia Ryan is entitled to absolute immunity here."[14] Consequently, plain-

May 31, 2001)). *Accord Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc.,* 233 F.R.D. 355, 361 (S.D.N.Y.2005) ("[A] movant may not raise on a motion for reconsideration any matter that it did not raise previously to the court on the underlying motion sought to be reconsidered.").

6. *United States v. Treacy,* No. 08 CR 366, 2009 WL 47496, at *1 (S.D.N.Y. Jan. 8, 2009) (quotation marks omitted). *Accord Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995) (holding that a court will deny the motion when the movant "seeks solely to relitigate an issue already decided").

7. *Makas v. Orlando,* No. 06 Civ. 14305, 2008 WL 2139131, at *1 (S.D.N.Y. May 19, 2008) (quoting *In re Houbigant, Inc.,* 914 F.Supp. 997, 1001 (S.D.N.Y.1996)).

8. *Associated Press v. United States Dep't of Defense,* 395 F.Supp.2d 17, 19 (S.D.N.Y. 2005).

9. *See Grand Crossing,* 2008 WL 4525400, at *3.

10. Pl. Ltr. at 1.

11. The fact that defendants raised their federal immunity arguments in their reply brief is not relevant for purposes of plaintiff's request for reconsideration, and plaintiff does not argue to the contrary. On the one hand, "as a general rule all meritorious arguments should be considered in ruling on a case." *Playboy Enterprises, Inc. v. Dumas,* 960 F.Supp. 710, 720 n. 7 (S.D.N.Y.1997). On the other hand, the rationale of fair play which permits courts to disregard arguments first raised in reply papers is not implicated here. Plaintiff specifically requested and was granted permission to submit a sur-reply to any novel issues presented in defendants' reply brief. *See* Docket Entry No. 183. Both sides thus had an opportunity to be heard, and as plaintiff points out in his 8/24/10 Letter to the Court, courts have broad discretion to consider arguments in a sur-reply. *See also Westchester Fire Ins. Co. v. Massamont Ins. Agency, Inc.,* 420 F.Supp.2d 223, 226 (S.D.N.Y.2005).

12. Defendants' Reply Memorandum in Support of Their Motions in Limine ("Def. Rep."), at 7–8.

13. Pl. Ltr. at 2.

14. Def. Rep. at 8. Plaintiff argues that because "defendants never invoked *Imbler* [*v. Pachtman*] immunity, a doctrine of federal com-

tiff's claim that he "had no notice that *Imbler*'s functional test was ever on the table" is baseless,[15] as is his claim that "it was error for the Court to enter judgment on an issue never raised by the parties."[16]

*Second,* plaintiff posits that "on the merits, Ryan's forensic testing and misreporting is an act of investigation, not advocacy, so *Imbler* immunity does not apply."[17] In support of this argument, plaintiff cites patently inapposite cases. As noted in the 9/14/10 Opinion, whether an individual is entitled to absolute immunity is based on a case by case inquiry of the specific function she was engaging in at the time of the challenged conduct, not her official position or title.

That some forensic examiners have not been granted immunity has no bearing on Ryan—the importance of any immunity holding cannot be considered apart from the context in which the actor in question was acting. Thus, the two out-of-Circuit cases cited by plaintiff are easily distinguished. Neither case addresses the role of forensic examiners in a post-conviction setting. Instead, both involve *pre-trial investigative activities in preparation for prosecution*—circumstances that the 9/14/10 Opinion specifically noted may not be appropriate for absolute immunity.[18]

*Third,* plaintiff argues that "forensic scientists have no qualified immunity for misrepresenting the evidence, because false reporting by any official, at any stage of the proceedings, violates clearly established constitutional law."[19] In support of his claim that the "constitutional bar on falsifying evidence is unequivocal and longstanding," plaintiff cites to three cases.[20] However, none of these cases involves the mishandling of evidence in a post-conviction context—instead, they concern due process violations that arise from injuries to a defendant's pre-conviction liberty interest.[21] Because post-conviction defen-

---

mon law, the issue was not briefed by either side." Pl. Ltr. at 2. But while *Imbler* was a seminal Supreme Court decision, federal immunity doctrines are not contained within or limited to one decision. While defendants did not specifically cite *Imbler,* they cited a subsequent Supreme Court decision that adopted *Imbler*'s immunity rationale and specifically laid out the federal framework for absolute immunity. *See* Def. Rep. at 8 (citing *Cleavinger v. Saxner,* 474 U.S. 193, 201, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985), to note that "courts adopt a 'functional approach' to determining immunity, by considering 'the nature of the responsibilities of the individual official ....'"). Indeed, *Imbler* is one of many Supreme Court decisions supporting the proposition that government officials engaged in discretionary activities are entitled to absolute immunity if their challenged conduct was integral to an advocacy function.

**15.** Pl. Ltr. at 3 n. 5.

**16.** *Id.* at 3.

**17.** *Id.* at 1.

**18.** *See Gregory v. City of Louisville,* 444 F.3d 725 (6th Cir.2006) ("Under the Supreme Court's functional test, the *pre-trial investiga-*

tory acts by forensic examiners merit no more protection under absolute immunity than do other persons performing investigatory actions.") (emphasis added); *Keko v. Hingle,* 318 F.3d 639, 644 (5th Cir.2003) ("[T]o the extent Dr. West's *pre-testimonial* activities were investigative, his immunity ought to correlate with the merely qualified immunity granted to the police for comparable activities.") (emphasis added).

**19.** Pl. Ltr. at 1.

**20.** *Id.* at 4.

**21.** *See Miller v. Pate,* 386 U.S. 1, 3–4, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967) (holding that "the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence" where prosecutor deliberately misrepresented paint splatter on defendant's shorts as blood in order to secure a conviction); *Brown v. Miller,* 519 F.3d 231, 237 (5th Cir.2008) ("A criminal defendant's due process rights are violated when the government obtains a conviction with testimony that government agents know is false."); *Pierce v. Gilchrist,* 359 F.3d 1279 (10th Cir.2004) (finding a due process viola-

dants do not enjoy the same due process protections, and New York state did not establish a right to access post-conviction evidence until six years after Ryan's alleged misconduct, Newton does not cast doubt on the qualified immunity analysis set forth in the 9/14/10 Opinion.

Accordingly, plaintiff does meet the standard for reconsideration, and his request for leave to file a motion for reconsideration is denied.

SO ORDERED.

tion where a forensic scientist's deliberate or reckless falsification of evidence provided a basis for the charges against the defendant and influenced the District Attorney's decision to proceed to trial). In contrast, Ryan only entered the scene after Newton's conviction, and her errors did not contribute to the jury's determination that he was guilty—indeed, Newton's conviction was based solely on eye witness testimony and V.J.'s testimony. *See* Compl. ¶ 88.